UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------x
                                              :
MABLE RIVERA, et al.,                         :
                                              :
                              Plaintiffs,     :        06 Civ. 7077 (TPG)
                                              :
            – against –                       :          **<u>OPINION</u>**
                                              :
JOHN MATTINGLY, et al.,                       :
                                              :
                              Defendants.      :
                                              :
---------------------------------------------x

The claims in this case arise from the removal of three children—the infant plaintiffs in this action—from the home of Mable and Anthony Rivera, the children's foster parents and relatives.  Plaintiffs allege that New York City's Administration for Children's Services ("ACS") and its contracted social service agency, Family Support Systems Unlimited, Inc. ("FSSU"), removed the infant plaintiffs from the Riveras' kinship foster home without due process of law.  Plaintiffs also allege that this removal violated the Fourth Amendment and state law.  Plaintiffs seek monetary and declaratory relief.  In addition to asserting claims against New York City (because ACS is a City agency) and FSSU, plaintiffs bring claims against several New York City and FSSU employees.  They have also named the Commissioner of the New York State Office of Children and Family Services ("OCFS") as a defendant.

FSSU and certain FSSU employees (the "agency defendants") move for summary judgment.  The agency defendants argue that they did not violate the

Riveras' due process rights or their rights under the Fourth Amendment and state law.  Plaintiffs cross-move for summary judgment against the agency defendants.

The agency defendants' motion for summary judgment dismissing the federal law claims is granted.  The federal law claims having been dismissed, the court declines to retain jurisdiction of the state law claims against these defendants, and they are dismissed.

Plaintiffs' cross-motion for partial summary judgment against the agency defendants is denied.

## FACTS

The following facts are not in dispute unless otherwise stated.

Mable and Anthony Rivera have been married for over thirty years. Mable's sister is Betty Chapman Fields, who is now deceased.  Betty's daughter (and Mrs. Rivera's niece) is Ramona Ledbetter.

Ramona gave birth to Ashley on December 25, 1993 and Laporsha on December 1, 1994.  Ashley and Laporsha share the same father. Subsequently, Ramona gave birth to two daughters with another man.  The first, E.S., was born on January 10, 1998, and the second, B.C., was born on February 27, 1999.  E.S. and B.C. are Ashley and Laporsha's half-sisters.  Mrs. Rivera is grand-aunt to all four girls.

Betty Chapman Fields' other daughter, Latoya Chapman, has a daughter named J.C., who was born on September 19, 1997.  J.C. is first cousin to Ashley, Laporsha, E.S., and B.C.  Mrs. Rivera is J.C.'s grand-aunt.

Prior to entering foster care and living with the Riveras, Ashley, Laporsha, and J.C. lived with Betty Chapman Fields.  In December 1998, ACS removed them from Betty's care.  Later that month, Mrs. Rivera agreed to take in Ashley, Laporsha, and J.C.

At this time, the Riveras entered into a foster parent contract with FSSU. The agreement states that the children may be removed and provides that foster parents have the right to an Independent Review and a Fair Hearing as a means of challenging agency actions.

E.S. and B.C. entered foster care in December 1999.  Upon entering foster care, E.S. and B.C. were placed with the Riveras.

The Riveras live in a two-family house in Cambria Heights, Queens.  As of March 31, 2006, the Riveras, Laporsha, Ashley, E.S., B.C., and J.C. lived in the lower floors of the house.  As of this date, Ashley, Laporsha, and J.C. had lived there for about eight years, while E.S. and B.C. had lived there for about seven years.  The Riveras' adult daughter, Rhonda, and her two sons also lived in an apartment on the top floor of this house.

On March 31, 2006, Ashley told her mother, Ramona, that her sister, Laporsha, was in the upstairs apartment having sex with Rhonda's boyfriend, Leandro Johnson.  At this time, Mrs. Rivera was away from the house, and Mr. Rivera was in the backyard playing with B.C., J.C., and one of his grandsons. Rhonda called FSSU to report the allegation.

Upon learning of the allegation, FSSU Supervisor Andrea Cummings and Case Worker Anny Garcia went to the Rivera home to check on the girls' safety.

After arriving, Ashley told Cummings that Laporsha and Johnson were locked in the bathroom having sex.  Later, Laporsha and Ashley told Cummings that Johnson had previously showed them a pornographic movie in Rhonda's apartment.  The agency defendants also assert that Laporsha told Cummings that while watching this movie, Johnson touched Laporsha on the "butt" and breasts and told her that "he wanted to do what was in the movie to her."

Plaintiffs assert that Laporsha later admitted that no one was having sex and that Ashley had made up the story to get her in trouble.  Plaintiffs add that Laporsha and Ashley have a history of telling lies.

In any event, when Mrs. Rivera returned home, she spoke with the FSSU employees about whether the children should be brought to the agency or hospital to be examined.  Ultimately, Mrs. Rivera informed Garcia and Cummings that she objected to taking the girls to the agency, because the agency "could say anything," whereas the hospital could provide "an objective opinion" about whether the children had been sexually abused.  While Garcia and Cummings were on the telephone with their supervisor, Mrs. Rivera put Laporsha, Ashley, E.S., B.C., and J.C. into her car to take them to the hospital. When Cummings ran after the car to find out what Mrs. Rivera was doing, Mrs. Rivera locked the car doors and proceeded to Franklin General Hospital in Nassau County.

Although Garcia and Cummings did not know what Mrs. Rivera was doing when she left with the children, Mrs. Rivera had told Rhonda before she left that she was taking the children to the hospital.  She also subsequently

called FSSU Supervisor Felix Madu and explained where she was taking them. FSSU reported the allegations of sexual abuse to the State Central Registry, which is a statewide registry of child abuse reports maintained by OCFS.

At the hospital, the girls were examined by a physician and interviewed by a hospital social worker, a New York City Police Detective from the Special Victims Unit, and an investigator from ACS's Office of Confidential Investigations ("OCI").[1]  Plaintiffs assert that all of these individuals concluded that none of the five girls had been sexually assaulted or abused.  However, the agency defendants assert that the examination simply showed no physical evidence of sexual penetration.  Also, the agency defendants note that the NYPD Detective told Cummings and Garcia that the children should not be returned to the Rivera home at that time.

Although Mrs. Rivera told Cummings that she would bar Johnson from her house, FSSU Associate Vice-President, Reheme Bukenya, instructed Cummings and Garcia to temporarily remove the children from the Riveras' home.  In her instructions, Bukenya anticipated a temporary removal for a few days while OCI performed an investigation.  FSSU's stated reason for the removal was concern as to whether the Riveras were providing the children with adequate guardianship.  At the time of the removal, FSSU did not inform the Riveras of their right to challenge the removal through an Independent Review.

After the removal, Mrs. Rivera contacted the children's law guardian, who

---

[1] OCI is now known as the Office of Special Investigations.

informed her that she had a right to request an Independent Review of the removal decision, which would be a social work conference conducted by ACS. On April 3, 2006, Mrs. Rivera requested an Independent Review, and ACS held it on April 18.  Although the Riveras and the children's law guardian attended, they were excluded from a portion of the proceeding, and plaintiffs assert that they were not permitted to question witnesses.

Mina Shah was the Independent Review Officer at this conference.  Shah issued a written report on May 8 which stated that the children were not to be returned to the Riveras and were to be placed elsewhere.

The Riveras appealed Shah's decision by requesting a Fair Hearing before an OCFS administrative law judge ("ALJ").  Although plaintiffs state that they requested this Fair Hearing "immediately," they do not provide a date for their request.  The agency defendants concede, however, that Mrs. Rivera requested the Fair Hearing "within the time limits provided by law."

On July 14, before any Fair Hearing was held, OCI issued a report which concluded that the allegations of abuse had not been substantiated and that the allegations were "unfounded."  Mrs. Rivera claims that she called Michael Warren, an ACS Case Manager, in late July 2006 to discuss OCI's conclusions from this report.  On August 18, she went to FSSU to discuss the report further.  On August 23, FSSU performed a safety assessment of the Rivera home and determined that it was safe for the children.

Based on the July 14 OCI report and the August 23 safety assessment, FSSU determined that it would be appropriate to return the children to the

Rivera home.  As a result, the Fair Hearing, which had been scheduled for August 23, was adjourned until August 30 to effectuate the return of the children.

On August 25, Mrs. Rivera went to FSSU's office to pick up the children. When Mrs. Rivera arrived, however, Cummings informed her that she could not take the children.  The agency defendants have demonstrated that ACS overruled FSSU's decision to return the children.  They point to a statement by Diana Cortez, ACS's Bronx Borough Manager, Office of Case Management, to the effect that she believed that returning the children to the Rivera home would place them in imminent danger.  Cortez also wrote in a September 13, 2006 Family Services Progress Note that "ACS cannot support the return of the S/C children to the maternal great-aunt, Mable Rivera."  In addition, Warren stated that he ordered FSSU not to return the children, because he did not have possession of the OCI report and believed that he was bound by the Independent Review Officer's determination.

On August 30, plaintiffs appeared at OCFS's Special Hearing Office for their Fair Hearing.  Neither FSSU nor ACS appeared for this hearing, but the ALJ refused to enter a default against FSSU or ACS and adjourned the case until September 18.

On October 2, OCFS held the Fair Hearing.  At this hearing, Warren testified that he never contacted anyone at OCI to determine whether there was an ongoing investigation.  He also stated that this case was the first in which an Independent Review preceded the completion of OCI's investigation.  On

December 13, the ALJ issued a decision, finding that ACS and FSSU's decision to remove the children was "arbitrary and capricious."

On September 12, 2006, the Riveras commenced the present federal court action.  They applied for a temporary restraining order and a preliminary injunction to secure the return of E.S., B.C., and J.C.  The Riveras did not request the return of Ashley and Laporsha, because Ashley and Laporsha did not desire to return to their home.  In response to their application, the court indicated that the Riveras, as grand-aunt and grand-uncle, had a constitutional right to protection against arbitrary removal, but ultimately denied the applications, stating that it could not find that defendants violated plaintiffs' rights by removing E.S., B.C., and J.C. in light of the seriousness of the allegations about Johnson at the time of removal.

On December 11, 2006, the court held another hearing.  In view of the ALJ's Fair Hearing decision, which called the decision to remove the children "arbitrary and capricious," the court ordered defendants to return J.C. to the Riveras.[2]  On December 20, 2006, after receiving additional information about whether E.S. and B.C. desired to return to the Riveras' home, the court ordered defendants to return them as well.

In February 2007, Ashley, Laporsha, E.S., and B.C. reunited with their mother, Ramona.  In June 2007, Mr. and Mrs. Rivera formally adopted J.C.

---

[2] Although the ALJ's Fair Hearing decision was not issued until December 13, 2006—two days after the court's December 11, 2006 hearing, the ALJ's final decision was known to the parties as of December 11, 2006, and they discussed it in court on that date.

## STATUTORY REGIME

The following is background information concerning the New York statutory regime that is helpful to understand before addressing the motions pending in this case.

I.    Removal of Children From Foster Parents

The New York State Department of Social Services Regulations govern the removal of a child from a foster parent by an authorized agency and provide for notice and an opportunity for the foster parent to be heard.  18 N.Y.C.R.R. § 443.5.  In New York City, ACS has promulgated an Independent Review Protocol which specifically sets forth the procedures to be followed in connection with a removal.

In particular, the Social Services Regulations permit immediate removal without advance notice to the foster parent where such removal is necessary to protect the health and safety of the child.  Id. § 443.5(a)(1).  New York City Protocol requires, however, that in such situations, notice must be given to the foster parent at the time of the removal, or as soon as is practicable.  Protocol ¶ II.A.  The notice must explain the reason for removal and must advise the foster parent that she can request an Independent Review, which is a social work conference with a City official in which she can challenge the removal.  18 N.Y.C.R.R. § 443.5(a)(2); Protocol ¶ II.A.  Once an Independent Review is requested, it must take place within ten days.  18 N.Y.C.R.R. § 443.5(b); Protocol ¶ III.A.

II.   <u>Independent Review</u>

At the Independent Review, which is held by ACS, an Independent Review Officer interviews everyone in attendance and makes a decision based on the interviews and relevant reports and documentation.  Protocol ¶ IV.D. The Independent Review is not a legal proceeding, and the foster parent does not have the right to question other participants in the conference or object to questions asked by the Independent Review Officer.  <u>Id.</u> ¶ IV.D.-F.  The Independent Review Officer must issue a decision within five days of the conference.  This decision must advise the foster parent of her right to appeal to OCFS for a Fair Hearing.  18 N.Y.C.R.R. § 443.5(c).

III.   <u>Fair Hearing</u>

If the foster parent disagrees with the Independent Review Officer's conclusion, she may appeal to OCFS and request a Fair Hearing before an ALJ within 60 days.  <u>Id.</u>  § 358-3.5(b)(1).  The Fair Hearing provides additional safeguards not available in the Independent Review, such as the opportunity for the foster parent to cross-examine witnesses, present evidence, and request records from the agency.  <u>Id.</u> at § 358-3.4.

After the parties make their case, the ALJ submits a recommendation to the Commissioner of OCFS who makes the final decision on whether the removal was proper.  The decision must be in writing; must be based exclusively on the Fair Hearing record; must set forth the Fair Hearing issues, the relevant facts, law, regulations, and approved policy, if any, upon which the decision is based; must make findings of fact, determine the issues and state

reasons for the determinations; and, when appropriate, must direct specific action to be taken by the authorized agency.  Id. at § 358-6.1(a).

The Commissioner's decision is binding with respect to the plaintiff's status as a foster parent.  Id. at § 358-6.4(a).  If the decision is adverse to the foster parent, she may seek judicial review in New York Supreme Court pursuant to Article 78 of the New York Civil Practice Law and Rules ("CPLR").  N.Y. Soc. Serv. Law § 22(9).

## THE PRESENT ACTION AND PENDING MOTIONS

On January 15, 2008, plaintiffs filed an Amended Complaint.  In this complaint, Mable and Anthony Rivera bring claims individually and as next friends for E.S. and B.C., and Andrea Zellan brings claims individually and as next friend for J.C.  The action is against the City of New York, FSSU, and several individuals in their individual and official capacities.  The individuals are John Mattingly, Commissioner of ACS; Mina Shah, independent review officer employed by ACS; Michael Warren, case worker employed by ACS; Carolyn Williams, supervisor employed by ACS; Diana Cortez, ACS manager; Anny Garcia, case worker employed by FSSU; Fabian Njoku, case worker employed by FSSU; Andrea Cummings, supervisor employed by FSSU; Rehema Bukenya, associate vice-president of FSSU; and John Johnson, Commissioner of OCFS.

Plaintiffs bring this action under 42 U.S.C. § 1983, alleging that ACS and its contracted social service agency, FSSU, removed the infant plaintiffs from the Riveras' kinship foster home without due process of law in violation of the

Fourteenth Amendment.  Plaintiffs also allege that this removal constituted an unlawful seizure in violation of the Fourth Amendment.  Further, they claim that the removal was an unlawful interference with plaintiffs' custody rights and a gross deviation from professional standards under state law.  They seek monetary and declaratory relief.

On September 1, 2010, FSSU, Cummings, and Bukenya (the "agency defendants") moved for summary judgment.[3]  They argue that the Riveras lacked a liberty interest in preserving their kinship foster home and that even if plaintiffs had a liberty interest, they did not violate plaintiffs' due process rights.  The agency defendants also argue that they did not violate plaintiffs' Fourth Amendment rights or their rights under state law.

On November 5, 2010, plaintiffs cross-moved for summary judgment against the agency defendants.  In their cross-motion, they argue that the agency defendants violated their constitutional and state law rights.

### DISCUSSION

Summary judgment may be granted if there is no genuine issue as to any material fact, such that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A fact is material only if it "might affect the outcome of the suit under the governing law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id.  The

---

[3] Although plaintiffs' Amended Complaint names two other FSSU employees as defendants—Garcia and Njoku—plaintiffs' counsel asserts that Garcia has defaulted and that they were unable to serve process on Njoku.  As a result, the present motions for summary judgment do not concern Garcia and Njoku.

movant has the burden of showing that no genuine factual dispute exists.  Id.
However, in determining whether a genuine issue of material fact exists, the
court must construe the evidence in the light most favorable to the non-moving
party and draw all justifiable inferences in that party's favor.  Id. at 249.

I.      Subject Matter Jurisdiction

As a threshold matter, the agency defendants argue that the court lacks
subject matter jurisdiction over this dispute, because plaintiffs seek to attack a
state court judgment in federal court in violation of the Rooker-Feldman
doctrine, which bars such collateral attacks.  Exxon Mobil Corp. v. Saudi Basic
Indus. Corp., 544 U.S. 280, 284 (2005).  The state court judgment to which
defendants refer is the ALJ's December 13, 2006 Fair Hearing decision.
Although this decision was favorable to plaintiffs, they challenge the
constitutionality of the State's Fair Hearing procedures by arguing that the ALJ
could not provide a meaningful opportunity to be heard, because she had no
power to order the return of the children.  Accordingly, defendants contend
that this challenge amounts to an impermissible attack on a state court
judgment.  See id.

However, the Rooker-Feldman doctrine "has no application to judicial
review of executive action, including determinations made by a state
administrative agency."  Verizon Md, Inc. v. Public Service Comm'n of Md., 535
U.S. 635, 645 n.3 (2002).  Indeed, the Second Circuit has held that this
principle "holds true even where the administrative agency acted in an
adjudicative capacity."  Mitchell v. Fishbein, 377 F.3d 157, 165 (2d Cir. 2004).

Thus, the Rooker-Feldman doctrine does not deprive the court of subject matter jurisdiction over this action, because plaintiffs may challenge the constitutionality of the administrative review that they received in their Fair Hearing before the ALJ.  See id.

II.    Law of the Case

Plaintiffs also argue, as an initial matter, that the agency defendants' motion is barred by the law of the case.  Specifically, plaintiffs point to the court's statements in its fall 2006 preliminary injunction hearings, in which the court indicated that the Riveras had a constitutional right to protection against arbitrary removal but stated that it could not find that defendants violated their rights by removing the children.

However, the law of the case doctrine "is not typically applied in connection with preliminary determinations, such as a ruling on a motion for a preliminary injunction."  Garten v. Hochman, No. 08 Civ. 9425, 2010 WL 2465479, at *3, n.1 (S.D.N.Y. June 16, 2010).  The reason is that "a preliminary determination of a likelihood of success on the merits in a ruling on a motion for preliminary injunction is ordinarily tentative, pending a trial or motion for summary judgment."  See Goodheart Clothing Co., Inc. v. Laura Goodman Enters., Inc., 962 F.2d 268, 274 (2d Cir. 1992).  Thus, it would be "anomalous . . . to regard the initial ruling as foreclosing the subsequent, more thorough consideration of the merits that the preliminary injunction expressly envisions."  Id.

Here, the court's statements from fall 2006 were made in connection with

plaintiffs' application for a temporary restraining order and preliminary injunction.  Thus, they were made in the context of a preliminary determination and do not foreclose "more thorough consideration of the merits." Goodheart Clothing Co., Inc., 962 F.2d at 274.  As a result, the law of the case doctrine does not bar the agency defendants' motion for summary judgment, nor does it bar plaintiffs' cross-motion.

III.   Due Process Claims

The Due Process Clause of the Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.  Courts have interpreted this clause as imposing both procedural and substantive limits on the government's ability to deprive a person of life, liberty, or property.  See, e.g., Southerland v. Giuliani, 4 Fed. Appx. 33, 36 (2d Cir. 2001).  Here, plaintiffs allege both procedural and substantive due process violations, and the court will consider them in turn.

A.   Procedural Due Process

To assess procedural due process questions, the court must first ask "whether there exists a liberty or property interest which has been interfered with by the State," and, second, "whether the procedures attendant upon that deprivation were constitutionally sufficient." Kentucky Dep't of Corr. v. Thompson, 490 U.S. 454, 460, (1989).

The Second Circuit has held that biologically-related foster parents possess a "liberty interest in preserving the familial relationship" with their foster children.  Rivera v. Marcus, 696 F.2d 1016, 1024-25 (2d Cir. 1982).

Moreover, biologically-related foster parents are to be afforded constitutional due process protections with regard to the removal of foster children under their care.  Id.

Here, Mrs. Rivera is grand-aunt to E.S., B.C., and J.C. and is thus biologically related to them.  All three children began living with the Riveras at a very young age.  When the Riveras took them in, E.S. was about 19 months old, B.C. was about nine months old, and J.C. was about 14 months old.  E.S. and B.C. then lived with the Riveras for about seven years prior to the removal, and J.C. lived with them for about eight years prior to the removal.  As a result, the children came to live with the Riveras essentially at their birth, thereby creating a strong relationship.  See Balbuena v. Mattingly, No. 05 Civ. 2986, 2007 WL 2845031, at *6 (S.D.N.Y. Sept. 25, 2007).  Further, there is no indication that the natural parents, who are both nieces of Mrs. Rivera, objected to the placement of their children with the Riveras.  See A.C. v. Mattingly, No. 05 CV 2986, 2007 WL 894268, at *5 (S.D.N.Y. Mar. 20, 2007).  Accordingly, plaintiffs have shown that they possess a constitutionally protected liberty interest in the integrity of their kinship foster family as a matter of law.

After recognizing the Riveras' liberty interest, the court must consider whether the procedures used by the state adequately protected that interest.  Rivera, 696 F.2d at 1026 (citing Matthews v. Eldridge, 424 U.S. 319, 332-33 (1976)).  In Balbuena, this court noted that the Supreme Court had previously upheld New York's procedural regime for the removal of children as applied to

- 16 -

foster parents, whom they assumed had a protected liberty interest.  2007 WL 2845031, at *6-9, citing Smith v. Org. of Foster Families for Equality & Reform ("OFFER"), 431 U.S. 816 (1977).  Even though the statutory citations and regulations have changed slightly since the Supreme Court's opinion in OFFER, New York's regulations, which provide for an Independent Review and a Fair Hearing, are constitutional, even in the context of immediate removals. Id.

Of course, if constitutional procedures are not properly followed or applied, this can result in violations of constitutional rights.  That is what plaintiffs claim in this case.  Specifically, plaintiffs contest the adequacy of the procedures utilized by the agency defendants before and after the removal of E.S., B.C., and J.C.  The court will address these issues in turn.

With regard to plaintiffs' allegations of pre-removal due process violations, the regulations provide for immediate removal of children from a foster home when allegations of child abuse are presented.  See 18 N.Y.C.R.R. § 443.5(a)(1).  Here, FSSU removed the children upon hearing that Johnson, the boyfriend of the Riveras' adult daughter and a frequent visitor to their home, was having sex with one of the children and had previously shown them a pornographic movie.  Thus, FSSU's decision to remove the children did not violate procedural due process in light of these serious allegations of child abuse in the Riveras' home.

With regard to plaintiffs' allegations of post-removal due process violations, plaintiffs argue that the agency defendants failed to provide notice of

their right to an Independent Review.  Although plaintiffs did not receive formal notice of this right at the time of removal, they quickly learned about it and requested an Independent Review on Monday, April 3, 2006—the first business day after the removal.  Plaintiffs promptly received an Independent Review on April 18, 2006.

Plaintiffs also claim that this Independent Review lacked key procedural safeguards.  While it is true that the Independent Review, by itself, lacks important procedures such as the right to cross-examination, any procedural safeguards missing from the Independent Review are subsequently provided in the Fair Hearing.  Renaud v. Mattingly, No. 09 Civ. 9303, 2010 WL 3291576, at *6 (S.D.N.Y. Aug. 10, 2010).  In particular, the Fair Hearing gives plaintiffs the opportunity for a "trial-type hearing to dispute the removal," so this process, "in totality, comports with the due process protections due to kinship foster parents."  Id.

With regard to plaintiffs' contention that the delay before their Fair Hearing rendered the hearing constitutionally inadequate, their argument is that, although the Riveras' promptly received an Independent Review after the removal of E.S., B.C., and J.C. on April 18, 2006, the delay of the holding of the Fair Hearing until October 2 made the process unconstitutional.  However, there was considerable activity in this period of time.  There was not mere delay.  The Independent Review Officer issued her report on May 8.  OCI issued its report on July 14.  Mrs. Rivera spoke with Warren, an ACS Case Manager, in late July and went to FSSU's office to discuss OCI's report on August 18.

FSSU performed a safety assessment on August 23 and determined that it was safe to return the children to the Riveras' home.  As a result of this determination, the Fair Hearing was adjourned to August 30 to allow the return of the children.  However, ACS overruled FSSU and did not allow the children to be returned, thus requiring the Fair Hearing to be held.

FSSU and ACS admittedly failed to appear at the August 30 Fair Hearing. However, another Fair Hearing was scheduled for September 18 and the Fair Hearing was held on October 2.  The ALJ presiding at the Fair Hearing issued a decision on December 13 finding that FSSU and ACS had acted improperly to remove the children from the Riveras.

If this had been a simple and clean-cut case of improper removal and a desire of the children to return to the Rivera foster home, then it could surely be argued that it was unreasonable to take until December 13 to obtain a Fair Hearing decision regarding the removal which occurred on March 31, 2006. But the issue was far from simple, and required investigation and deliberation. There were allegations by both Ashley and Laporsha that Johnson had shown them a pornographic movie.  And Ashley alleged that Johnson had sex with Laporsha in the bathroom.  Laporsha later denied that she was having sex with Johnson and accused Ashley of lying about this.  But there were surely questions about what actually occurred and about whether Johnson was committing child abuse in the Rivera home.  Also, at least by September, it developed that Ashley and Laporsha did not wish to return to the Rivera home, and in February 2002 Ashley, Laporsha, E.S., and B.C. reunited with their

mother.  In June 2007, Mr. and Mrs. Rivera formally adopted J.C.

The inevitable conclusion from all these circumstances is that the time that elapsed after the removal of the children on March 31 was occupied with the Independent Review and the OCI investigation, followed by preparations for the Fair Hearing.  But more important than all this was something about which the court record contains almost no details, but which surely occurred—and that is resolving that Ashley, Laporsha, E.S., and B.C. would return to their mother and that J.C. would be adopted by the Riveras.  Viewing this entire picture, it cannot be said that there was a "delay" which deprived plaintiffs of due process.

The court notes the further claims of plaintiffs that the Fair Hearing was inadequate, because the ALJ had no power to order the return of the Riveras' children, given that the Commissioner of OCFS makes final decisions regarding the placement of foster children.  However, the procedure by which the ALJ makes a recommendation to the Commissioner of OCFS who has final authority to place the children in accordance with State law is reasonable and provides due process.  See id. at *7-8.  In any event, the issue raised by plaintiffs in this regard is not something that can be charged to the agency defendants, who are making the present motion.

To summarize, the court holds that it is conclusively shown on the present record that the agency defendants committed no violation of plaintiffs' procedural due process rights before or after the removal of the children in this case.

- 20 -

B.      Substantive Due Process

While a procedural due process inquiry examines the means by which the government deprived a plaintiff of a constitutionally-protected liberty interest, substantive due process "comes into play where, regardless of the procedures followed, a governmental decision or action is so contrary to a fundamental right that it cannot be countenanced." Nicholson v. Williams, 203 F. Supp. 2d 153, 237 (E.D.N.Y. 2002). Thus, even though a plaintiff may have a liberty interest sufficient to secure procedural due process protections, that interest might not be so fundamental that substantive due process protections are triggered. See OFFER, 431 U.S. at 843 n.48. Indeed, in holding that a biologically-related foster parent can have a liberty interest in the maintenance of family integrity in Rivera, the Second Circuit suggested that this interest may not implicate a fundamental right as required for "far-reaching substantive due process protection." Rivera, 696 F.2d at 1022 n.10.

Here, the court is aware of no cases in this circuit holding that a biologically-related foster parent has a fundamental right to maintaining the stability of her family. Thus, the court should not conclude that the Riveras, as grand-aunt and grand-uncle to E.S., B.C., and J.C., had a fundamental right to substantive due process protections when the agency defendants decided to remove their grand-nieces. This conclusion is consistent with the Supreme Court's admonition that courts should proceed cautiously when entertaining claims that would broaden the scope of substantive due process protections. See, e.g., Washington v. Glucksberg, 521 U.S. 702, 720–21 (1997)

(advising courts to "exercise the utmost care" when broadening substantive due process protections "lest the liberty protected by the Due Process Clause be subtly transformed into the policy preferences" of judges).

IV.   <u>Fourth Amendment Claim</u>

The Fourth Amendment protects against unreasonable seizures.  U.S. Const. amend. IV.  Plaintiffs claim that the agency defendants violated their rights under the Fourth Amendment by removing E.S., B.C., and J.C. from the Riveras' kinship foster home with no reasonable basis for removal.[4]

As a threshold matter, the agency defendants argue that the Fourth Amendment is not implicated, because the State assumed legal custody of the children when they were initially removed from their natural parents in 1998 and 1999.  Relying on this court's decision in <u>A.C.</u>, the agency defendants contend that because New York law grants authorized foster care agencies the power to change the placement of foster children in foster homes, FSSU's removal of E.S., B.C., and J.C. from the Riveras' kinship foster home on March 31, 2006 was not a seizure under the Fourth Amendment.  2007 WL 894268, at *5 (citing Social Services Law §§ 382(2), 400).  Instead, the only seizures that occurred were the initial removals of the children from their respective natural parents.  See <u>id.</u> at *5-6.

Plaintiffs respond that the Second Circuit has stated that the Fourth Amendment applies to removals of children "by a government-agency official

---

[4] Only E.S., B.C., and J.C. have standing to bring Fourth Amendment claims, because "Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted." <u>Tenenbaum v. Williams</u>, 193 F.3d 581, 602 n.13 (2d Cir. 1999).

during a civil child-abuse or maltreatment investigation." Kia P. v. McIntyre, 235 F.3d 749, 762 (2d Cir. 2000). Moreover, plaintiffs argue that the Second Circuit recognized in Kia P. that more than one seizure can occur per foster case. Plaintiffs claim that in Kia P., the Second Circuit recognized two seizures of a newborn child—one when "the government" removed her, and another when the hospital where she was born seized her while it was awaiting state approval to release her. See Kia P., 235 F.3d at 762.

Plaintiffs fail to persuade the court that the Fourth Amendment is implicated after a child is in the State's legal custody. See A.C., 2007 WL 894268, at *5-6; but see Renaud, 2010 WL 3291576, at *8 (applying Fourth Amendment analysis to removal of child from kinship foster home). Although the Second Circuit has recognized that the Fourth Amendment applies to removals of children in child abuse investigations, in all such cases the children at issue were previously in the legal custody of their natural parents, not the state. See, e.g., Kia P., 235 F.3d at 762. Thus, these cases are inapplicable to the present case. See A.C., 2007 WL 894268, at *6.

Further, plaintiffs misunderstand the facts of Kia P. In that case, a hospital detained a newborn child in its private capacity while awaiting medical test results, and the hospital only became a state actor once it continued to detain the child after receiving the test results and before it received state approval to release the child. Kia P., 235 F.3d at 756-57, 762. Thus, only one Fourth Amendment seizure occurred in Kia P.—the detention that took place while the hospital was a state actor. Consequently, plaintiffs have not pointed

to any Second Circuit cases holding that Fourth Amendment seizures occur when foster children in the state's legal custody are moved from one foster home to another.  Thus, their Fourth Amendment claim fails as a matter of law.

V.      State Law Claims

       The agency defendants have moved for summary judgment on plaintiffs' state law claims, and plaintiffs have cross-moved for summary judgment "on liability" against all of the agency defendants.  Now that the federal law claims have been dismissed, the court will not retain jurisdiction of the state law claims against the agency defendants and dismisses the latter claims.

## CONCLUSION

The motion of defendants FSSU, Cummings, and Bukenya (the agency defendants) for summary judgment dismissing the federal law claims is granted.  The federal law claims having been dismissed, the court declines to retain jurisdiction of the state law claims against these defendants, and they are dismissed.

Plaintiffs' motion for partial summary judgment against the above defendants is denied.

This opinion resolves document numbers 103 and 114 on the docket.

SO ORDERED.


Dated:  New York, New York
        September 12, 2011

_____
Thomas P. Griesa
U.S.D.J.


USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 9 / 12 / 11

- 25 -