UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 3/30/15

---------------------------------------X

MABLE RIVERA, et al.,                  :     06 Civ. 7077(LAP)
                                       :
                    Plaintiffs,        :
                                       :
                                       :           ORDER
          v.                           :
                                       :
JOHN MATTINGLY, et al.,                :
                                       :
                    Defendants.        :
                                       :
---------------------------------------X

LORETTA A. PRESKA, Chief United States District Judge:

     Before the Court are two motions for summary judgment

pursuant to Rule 56 of the Federal Rules of Civil Procedure.

The first motion [dkt. no. 180] was brought by the City of New

York ("City") and New York City Administration for Children's

Services ("ACS") employees John Mattingly, Michael Warren, Ruth

Thomas,[1] Carolyn Williams, and Diana Cortez (collectively the

"City Defendants"[2]).  The second motion [dkt. no. 196] was

brought by John Johnson, a former commissioner of the New York

Office of Children and Family Services ("OCFS").  Both motions

---

[1] Plaintiffs have since voluntarily dismissed their claims
against Defendant Thomas.  (See Pls.' Mem. in Opp. [dkt. no.
188], at 5 n.9.)
[2] Review Officer Mina Shah has not moved for summary judgment,
but the City Defendants request that the Court extend any
relevant ruling to her.  (See City Defendants' Mem. in Supp.
[dkt. no. 180], at 1 n.1.)   Since doing so will not prejudice
Officer Shah, and Plaintiffs do not object, the Court will
consider her a City Defendant for the purposes of this motion.

1

arise from the emergency removal of foster children E.S., B.C., and J.C. (the "Infant Plaintiffs") from the home of Plaintiffs Mable and Anthony Rivera following allegations of sexual abuse.

Plaintiffs bring claims for damages as well as injunctive and declaratory relief pursuant to 42 U.S.C. § 1983 on the theory that the removal of the children and failure to return them in a timely manner following investigation violated the Plaintiffs' rights under the Fourth and Fourteenth Amendments of the United States Constitution as well as under New York law. For the reasons that follow, City Defendants' motion [dkt. no. 180] and Defendant Johnson's motion [dkt. no. 196] are each GRANTED in their entirety.

## I.   BACKGROUND

The events giving rise to this litigation and the relevant statutory scheme are laid out in Hon. Thomas P. Griesa's Opinion dated September 12, 2011 [dkt. no. 139] granting summary judgment and dismissing the claims against Family Support Systems Unlimited, Inc. ("FSSU") and FSSU employees Andrea Cummings and Rehema Bukenya (collectively the "Agency Defendants"). The facts relevant to the instant motions are laid out again below and are undisputed except as noted.

## a. Statutory Regime

The New York State foster care system is administered by the New York Office of Children and Family Services ("OCFS") and its Commissioner. See N.Y. Soc. Serv. L. §§ 371, 383-c. OCFS manages the system through local districts, and in New York City, the local authority is New York's Administration for Children's Services ("ACS"). N.Y. Soc. Serv. L. § 395; Finch v. N.Y. State Office of Children & Family Servs., 499 F. Supp. 2d 521 (S.D.N.Y. 2007). In order to effectuate a state-law enshrined policy favoring the placement of children with relatives rather than non-relatives, see generally N.Y. Fam. Ct. Act § 1017(1)-(2)(a), New York has streamlined the process by which individuals can be approved to become foster parents of their relatives (so-called "kinship foster" relationships). See N.Y. Soc. Serv. L. § 375; N.Y. Comp. Codes R. & Regs. tit. 18, § 443.7 (2014). In spite of this preference for placement of children in kinship foster homes, in the context of the removal of foster children, the regulatory scheme provides a single-track system that does not differentiate between foster and kinship-foster parents.

The decision to remove a child from a foster parent's home is within the discretion of the local district. N.Y. Soc. Serv. L. §§ 383(2), 400(1). OCFS regulations provide that when an agency or official "proposes to remove a child" from a foster

home, notice "of the intention to remove the child" must be provided to the foster parents. N.Y. Comp. Codes R. & Reg. tit. 18, § 443.5. The notice must be in writing, "must be given at least ten days prior to the proposed effective date of removal, except where the health or safety of the child requires that the child be removed immediately from the foster family home," and "must further advise the foster family parents that they may request a conference with the social services official or a designated employee of the social services district" during which they will be advised of the reasons for removal and have the opportunity to be heard on why the child should not be removed. Id.

New York City ACS has its own practices for effecting notification pursuant to the state rules. (Pls. Ex. 25, Independent Review Outline [dkt. no. 186-5] ("Independent Review Outline"), at 1-2.) The City's outline of the removal process indicates that the protocol requires that when the agency proposes to remove a child, or, in the case of an emergency removal, when that removal is effected, the agency must fill out ACS Form CS-701D (see Pls. Ex. 27, Mem. of Linda Gibbs, Deputy Comm'r of NYC ACS, Subject: Revised Form CS-701D [dkt. no. 186-5] ("CS-701D Memo. & Form"), at IGL 01526-27) and provide it to the foster parents. (Independent Review Outline ¶ II.A.) The form, if issued pursuant to proper procedures, complies with

OCFS regulations by giving foster parents notice of the reasons for removal and their right to contest and appeal the decision. The text of the form lays out with some level of specificity the foster parents' right to request an Independent Review and a State Fair Hearing as well as the deadlines for doing so. (CS-701D Memo. & Form.) Ordinarily, the CS-701D is to be provided at least ten days prior to the proposed date of removal, but in emergencies the notice can be provided at the time of removal or as soon as is practicable thereafter. (Independent Review Outline ¶ II.A.1-2.)

After the foster parents request a conference with the social services official (the "Independent Review"), that conference must be held within ten days. (Id.) As the Independent Review is a social work conference and not a legal proceeding, foster parents are provided limited procedural rights: they are not entitled to be present for the entire proceeding, and they cannot question other participants or object to the Independent Review Officer's questions. (Id. ¶ IV.D.) After the conference, the Independent Review Officer who oversaw the Review must issue a written decision within five days. (Id. ¶ V.)

If the foster parents request an Independent Review and the Independent Review Officer upholds the removal, the foster parents can request a hearing in front of an impartial OCFS

officer pursuant to the Fair Hearing process detailed below.
(Id. ¶ V.C.)

### b. **Fair Hearing**

The appeal from an Independent Review decision comes in the
form of a "fair hearing in accordance with section 400 of the
Social Services Law," N.Y. Comp. Codes R. & Reg. tit. 18,
§ 443.5, which provides that "[a]ny person aggrieved by such
decision of a social services official may appeal to the
department pursuant to the provisions of section twenty-two of
this chapter," N.Y. Soc. Serv. Law § 400 (McKinney 2015).
Section twenty-two of that chapter dictates that upon appeal
"from decisions of social services officials or failures to make
decisions," "[t]he department shall review the case and give
such person an opportunity for a fair hearing thereon."[3]  N.Y.
Soc. Serv. Law § 22 (McKinney 2015).  It appears that the Fair
Hearing process can in some cases operate in parallel to the
Independent Review: "If you object to the removal of the

---

[3] "The department may also, on its own motion, review any
decision made or any case in which a decision has not been made
by a social services official within the time specified by law
or regulations of the department.  The department may make such
additional investigation as it may deem necessary, and the
commissioner shall make such decision as is justified and is in
conformity with the provisions of this chapter, the regulations
of the department, a comprehensive annual services program plan
then in effect pursuant to title twenty of the federal social
security act1 and any other applicable provisions of law."  N.Y.
Soc. Serv. Law § 22 (McKinney 2015).

child(ren) from your home, you may request a New York State fair hearing, whether or not you request a foster care agency conference or an Independent Review. The Independent Review is not a Fair Hearing and requesting one does not prevent you from also requesting a Fair Hearing. However, the child(ren) may be removed from your home following the decision of the independent reviewer." (CS-701D Memo. & Form, at IGL 01527.)

The Fair Hearing provides legal safeguards that are absent from the Independent Review, such as the opportunity to bring and cross-examine witnesses, present evidence, and examine the case record to the extent it is not confidential.[4] (Id.) Both the foster agency and ACS are required to comply with the decision issued following a Fair Hearing. (Id.)

The Fair Hearing occurs before an OCFS officer who has not previously been involved in the case – an Administrative Law Judge ("ALJ"). N.Y. Comp. Codes. R. & Reg. tit. 18, § 358-5.6(a), 443.5(c) (2015). Once the hearing has taken place, the ALJ must submit a report to the Commissioner of OCFS or the Commissioner's designee. Id. § 358-5.6(b)(9). The report must summarize the hearing and recommend a decision. Id. The Commissioner or his designee is then required to review the report and issue a formal decision (known as the "Decision After

_____

[4] For detailed Fair Hearing procedures, see N.Y. Comp. Codes. R. & Reg. pt. 358 (2015).

7

Hearing"). See N.Y. Soc. Serv. L. § 22(2) (McKinney 2015). In the event that the foster parents wish to contest the Fair Hearing decision, they can seek judicial review in New York Supreme Court pursuant to Article 78 of the New York Civil Practice Law and Rules ("CPLR"). Id. § 22(9)(b).

### c. **The Rivera Family**[5]

The family structure of the Rivera household at the time of the events at issue, in relevant part, was as follows: Mable and Anthony Rivera were acting kinship foster parents for five great-nieces — all grandchildren of Mable's sister, Betty Chapman Fields. Betty Chapman Fields had two daughters: Ramona Ledbetter and Latoya Chapman. Latoya Chapman had one daughter, J.C., born in 1997. Ramona Ledbetter had four daughters: Ashley, born in 1993, Laporsha, born in 1994, E.S., born in 1998, and B.C., born in 1999.

### d. **Foster Arrangements**

In December 1998, Ashley, Laporsha, and J.C. were in the care of Betty Chapman Fields, their grandmother, who shared a home with her mother, Ruth Chapman. At that time, ACS removed the children from the home and from Betty Chapman Fields' care

---

[5] Unless otherwise noted, the factual summary is drawn from Parties' respective 56.1 statements [dkt. nos. 182, 189, 190, 198, 204, 205]. For the sake of clarity, the Court omits those facts it deems irrelevant to the instant motions; however, the Court has reviewed the parties' submissions and renders its decisions on the entirety of the record before it.

because of allegations that Ruth Chapman had abused the children and that Betty Chapman Fields was unable to care for them as a result of psychological problems stemming from a medical condition. After the removal, the three children were briefly placed in separate foster homes; however, by December 17, 1998, the Riveras were being investigated as a potential foster care resource for the children. After receiving a call from ACS, Mrs. Rivera agreed to care for the children, and at some point therafter, the Riveras entered a contract with FSSU. The Foster Care Agreement provided that the children may be removed and that the Riveras, as foster parents, would have the right to an Independent Review and a Fair Hearing in the event they wanted to challenge an agency action.

In December 1999, E.S. and B.C. entered foster care and, like Ashley, Laporsha, and J.C., were placed with the Riveras. As of March 2006, the five great-nieces were still living with the Riveras in the Riveras' two-family house. (Pls. Ex. 1, Tr. of Hr'g before Hon. Thomas P. Griesa, Sept. 14, 2006 [dkt. no. 186-1], at 4.) The Riveras and their great-nieces occupied the bottom two floors of the building while the Riveras' adult daughter, Rhonda, lived in an apartment upstairs with her fifteen- and eight-year-old sons. Id.

### e. Sexual Abuse Allegations

On March 31, 2006, Ashley told her birthmother, Ramona Ledbetter, that her sister, Laporsha, was upstairs having sex with Rhonda's boyfriend, Leandro Johnson. Mr. Johnson had come over to the house to pick up one of Rhonda's sons. After receiving Ashley's call, Ramona called Mable Rivera on her cellphone and told her what Ashley had said. Ramona also called FSSU to report the alleged abuse. At the time of the alleged incident, Rhonda was not at home, and Mr. Rivera was in the backyard with B.C., J.C., and one of his grandsons, Lance. Mr. Rivera did not see Mr. Johnson that day.

Upon receiving Ramona's phone call, FSSU supervisor Andrea Cummings and case worker Anny Garcia went to investigate and determine whether the children were at risk. At the house, they spoke to Ashley and Laporsha. Ashley told Ms. Cummings that Laporsha and Mr. Johnson were locked in the bathroom having sex. When questioned, Laporsha said that Ashley was trying to get her in trouble. According to Ms. Cummings, both Ashley and Laporsha told her that Mr. Johnson had shown them pornographic movies in Rhonda's apartment.[6] According to Ms. Cummings, Laporsha stated

---

[6] Plaintiffs object and "deny that the statement is true." (Pls.' Resp. 56.1 ¶ 50.) Plaintiffs point out that the girls' statements about watching the video were inconsistent. (Id. at ¶ 49.) Notes from the investigation entered on April 5, 2006, indicate that both girls did claim to have seen naked people on the television, but their accounts did differ. Laporsha (cont'd)

that Mr. Johnson did not have sex with her, but that he "touched her" and was "making comments . . . that he wanted to do what was in the movie." (Defs.' Ex. H, Fair Hr'g Tr. [dkt. no. 106-2], at OCFS 71:20-25.)

Defendants assert that the other children told Ms. Cummings that Laporsha was having sex with Mr. Johnson and that they were watching a "sex movie." (Id. at 70:5-11.) However, Plaintiffs point out that J.C. told a city investigator that she had "never seen [Mr. Johnson] touch any of the girls and none of the girls ever told her anything like that." (Pls.' Ex. 6, Summary of Three Most Recent Investigations [dkt. no. 186-3], at OCFS 818.)

After speaking with Ashley and Laporsha, FSSU Social worker Anny Garcia informed Ms. Rivera that Laporsha had told her that Mr. Johnson had touched her, and so she had to take her to be examined. According to Ms. Cummings, she first suggested taking the children to the hospital but, when Ms. Rivera refused, suggested taking them to see a doctor at the Agency. (Defs.' Ex. H, Fair Hr'g Tr. [dkt. no. 106-2], at OCFS 75:6-25, 76:1-15.) According to Ms. Rivera, she was told that they would go to the Agency and responded by stating that in the past when

---

(cont'd from prev. page)
indicated the people on the screen were black, and that she had seen certain explicit sexual content; Ashley indicated that the people on the screen were white, and that she had seen nudity. (Pls. Ex. 6, Summary of Three Most Recent Investigations [dkt. no. 186-3], at OCFS 817-18.)

there had been allegations of abuse she had been instructed to take the children to the hospital. She asked what was different that would cause the protocol to change and explained that she would like to take them to the hospital for objective medical testing. According to the deposition testimony of Dana Guyet, ACS' Director of Advocacy, children who may have been sexually abused are ordinarily taken to a Child Advocacy Center where they are interviewed and examined. (Pls.' Ex. 65, Guyet Dep. [dkt. no. 186-12], at 39:13-25, 40:1-43:2.)

At some point, Ms. Rivera sent Ashley and Laporsha into her room to speak with them, a decision that Ms. Garcia and Ms. Cummings "did not agree" with. Ms. Rivera asked Ashley what had happened, to which Ashley replied "I don't know"; Laporsha told Ms. Rivera that Ashley had lied and that nothing had happened.

Ms. Rivera has at times stated that Ashley is a liar; similarly, ACS case manager Michael Warren has stated that he knows Ashley and Laporsha to have a history of telling lies. Ms. Rivera never asked Mr. Johnson directly whether he had engaged in inappropriate behavior with the girls but did tell him that he was not to come to her home anymore.

After speaking to the girls and to Ms. Cummings, Ms. Rivera had the girls get in the car, locked the doors, and drove to the hospital. Although it is undisputed that Ms. Garcia did not inform Ms. Garcia and Ms. Cummings about where she taking the

12

children, Plaintiffs assert that she did tell Rhonda what she was doing, and that Rhonda was staying behind with the caseworkers. Nonetheless, Ms. Rivera concedes that "they [Garcia and Cummings] didn't know what I was doing." However, Ms. Rivera asserts that she called FSSU supervisor Felix Madu to inform him of her actions.

After Ms. Rivera drove off, Ms. Cummings sought assistance from police officers in the area. (Defs.' Ex. H, Fair Hr'g Tr. [dkt. no. 106-2], at OCFS 76:20-22.)

That night, March 31, 2006, the FSSU workers reported the allegations of abuse to the State Central Register ("SCR"). In New York City, once a report is made to SCR, the City's Office of Confidential Investigations ("OCI") (now known as the Office of Special Investigations ("OSI")) is then exclusively responsible for investigating the allegations of abuse.

At the hospital that night, a police detective interviewed the children. According to Ms. Cummings, Detective Beam directed her not to allow the children to go home with the Riveras because he wanted her to bring them to the Queens Child Advocacy Center on Monday, April 3. (Defs.' Ex. H, Fair Hr'g Tr. [dkt. no. 106-2], at OCFS 105-07.) FSSU Associate Vice-President Rehema Bukenya, after learning that a police officer at the hospital believed the children should not go home, instructed Cummings and Garcia to temporarily remove the

children.  (Defs.' Ex. M, Bukenya Dep. [dkt. no. 106-3], at 104–05.)  Bukenya stated that the imminent risk posed at that time was "the condition with — in which Mrs. Rivera was in at that point in time and the fact that we didn't have any information on Leandro."  (Id. at 112–13.)  Bukenya also stated that the Riveras' reaction caused them to be "questioned for inadequate guardianship."  (Id. at 123:2-5.)

After being removed, Ashley and Laporsha did not want to return to the Riveras' house.  Ms. Cummings informed ACS Case Manager Michael Warren that she wanted to place the children temporarily in another home during the pendency of OCI's investigation.

### f. The Independent Review

On March 31, 2006, while at the hospital with the children, Ms. Rivera called E.S. and B.C.'s law guardian, Norah Bowler. (Pls.' Ex. 31, Decision After Independent Review [dkt. no. 186-6] ("Decision After Review"), at OCFS 769.)  Ms. Bowler informed her that she could request an Independent Review of the removal. (Pls.' Ex. 54, M. Rivera Dep. [dkt. no. 186-10] ("M. Rivera Dep."), at 57:21-22.)  The following Monday, April 3, 2006, Ms. Rivera did so request, and on April 18, 2006, Independent Review Officer Mina Shah conducted the inquiry.  All interested parties at the Review were permitted to address Officer Shah; however, the Riveras were excluded from the room during portions of the

Review and were not entitled to question other parties. (M.
Rivera Dep. 67; Pls. Ex. 58, Shah Dep. [dkt. no. 186-11] ("Shah
Dep."), at 20, 23-15.) Officer Shah issued a written report on
May 8, 2006, determining that that the children were not to be
returned and would be placed elsewhere. (Decision After Review,
at OCFS 771-72.) At the Review, Officer Shah instructed the
Riveras that they were entitled to appeal her decision to OCFS.
(Shah Dep., at 25:9-12.)

g. **Events Prior to the Fair Hearing**
Initially, the Fair Hearing was scheduled for July 12,
2006. However, Plaintiffs requested an adjournment of that date
to allow OCI to complete its investigation and issue its report,
so it was rescheduled for July 17. That date was then adjourned
to August 24, however, because the parties believed the report
was still not complete; as it turns out, OCI had actually issued
the report on July 14, 2006. The report outlined OCI's
investigation and found the allegations unsubstantiated, leading
to an ultimate determination of "unfounded."[7] (Pls.' Ex. 15,
Fair Hr'g Tr. [dkt. no. 186-4], at OCFS 674:12-25.)

On August 18, 2006, Ms. Rivera went to FSSU to discuss the
report and the return of the children. (Defs.' Ex. H, Fair Hr'g

---

[7] The parties dispute whether all of the allegations or merely
some of them were determined to be unfounded. (Pls.' Response
56.1 ¶ 100.)

Tr. [dkt. no. 181-8], at OCFS 697-98.)  On August 23, FSSU

performed a safety assessment of the Rivera home and found the

home to be safe for the children's return.  (Id. at OCFS 116:3–

12.)  On the basis of the Report and the safety assessment, FSSU

determined that the children would be returned to the Riveras on

August 25, and the Fair Hearing was adjourned to August 30,

2006.  (Id. at OCFS 381:9-25; 382:1-5; 408:10-17; 441:13-25;

442:2-5.)

On August 25, 2006, the Riveras were not allowed to take

the children home as planned.  According to Defendants, Mr.

Warren, the ACS Case Manager, was concerned about the

Independent Review and erroneously believed OCI had not yet

completed the investigation.  (Id. at OCFS 227-28; 258-59; 382;

408; 442.)  Plaintiffs characterize this decision as ACS

"overrul[ing]" FSSU, a characterization that FSSU Officer

Cummings agrees with.  (Id. at OCFS 382.)

On September 13, 2006, Diana Cortez, ACS Bronx Borough

Manager from the Office of Case Management, attended a meeting

in which ACS employees and FSSU representatives discussed

whether the children should be returned to the Riveras.  (Pls.

Ex. 57, Cortez Dep. [dkt. no. 186-11], at 142, 145.)  After the

meeting, Ms. Cortez wrote a Family Service Progress Note

indicating that "as per our meeting" and a review of "all

available documentation," including the OCI Investigation

Report, "ACS cannot support the return of the . . . children."
(Defs.' Ex. N. [dkt. no. 181-14], at FSSU 268-69.)

### h. **Fair Hearing**

When none of the Defendants appeared at the OCFS Fair
Hearing scheduled for August 30, 2006, the Administrative Law
Judge ("ALJ") adjourned the hearing rather than entering a
default judgment. (Pls.' Ex. 15, Fair Hr'g Tr. [dkt. no. 186-
4], at OCFS 3.) Following the adjournment, the Fair Hearing
began on October 2, 2006. On October 7, 2006, during the
continuation of the hearing, Mr. Warren was presented with the
OCI report and admitted that he had not seen it before. (Id. at
OCFS 245.) Mr. Warren further testified that in his experience,
an Independent Review decision would not be made until after the
completion of OCI's investigation report. (Defs.' Ex. H, Fair
Hr'g Tr. [dkt. no. 181-8], at OCFS 289-90.) Plaintiffs point
out that an Independent Review is required to be conducted
within ten days of the initial request.

Ultimately, the Fair Hearing spanned October 2, 11, 26, and
November 7, 2006, and on December 13, 2006, the designee of
State Commissioner John Johnson ruled that the removal of the
children was arbitrary and capricious. The designee remanded
the issue and directed the City Defendants to re-evaluate the
removal and determine the appropriateness of the children's

17

placement. (Pls.' Ex. 13, Decision After Hearing [dkt. no. 186-4] ("OCFS Decision"), at OCFS 747).)

### i. **The Instant Motions**

City Defendants now move for summary judgment on the following bases: 1) that the law of the case warrants a grant of summary judgment on all issues; 2) that there has been no violation of the Plaintiffs' constitutional rights, and so the claims must fail; 3) that Plaintiffs cannot demonstrate that municipal liability is appropriate; 4) that the individual defendants in their personal capacities are immune from suit; and 5) that the Court should decline jurisdiction over the state-law claims.

Defendant Johnson moves for summary judgment on similar grounds. He asserts: 1) that the removal procedures are constitutionally adequate and were reasonably applied; 2) that the Fourth Amendment claims fail as a matter of law; 3) that Plaintiffs fail to show that Johnson was "personally involved" in any deprivations, 4) that Johnson is qualifiedly immune from suit; and 5) that Plaintiffs' tort claims fail as a matter of law.

A movant is entitled to summary judgment where the submissions of the parties, taken together, reveal that "there is no issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

18

56(c).  A material fact is one that "might affect the outcome of the suit under the governing law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In deciding a motion for summary judgment the Court must construe the evidence "in the light most favorable to the non-moving party and draw all reasonable inferences in its favor."  American Casualty Co. of Reading, Pennsylvania v. Nordic Leasing, Inc., 42 F.3d 725, 728 (2d Cir. 1994) (citation omitted) (internal quotation marks omitted).  While the non-moving party does not need to "produce evidence that would be admissible at trial in order to avoid summary judgment," Rule 56 requires it to "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986) (quoting Fed. R. Civ. P. 56(e)).

## II.  LAW OF THE CASE

"The law of the case doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case."  Pescatore v. Pan American World Airways. Inc., 97 F.3d 1, 7-8 (2d Cir. 1996) (citations omitted) (internal quotation marks omitted).  The doctrine promotes consistency and efficiency by

19

helping to "avoid reconsideration of matters once decided during the course of a single lawsuit." Bonnie & Co. Fashions, Inc. v. Bankers Trust Co., 955 F. Supp. 203, 209 (S.D.N.Y. 1997) (citations omitted) (internal quotation marks omitted). Because the doctrine is discretionary, it does not limit the Court's authority to reexamine its earlier decisions, especially where there are "cogent or compelling reasons" for reconsideration. Id. (internal quotation marks omitted). In general, "[a]ny of three circumstances may justify reconsideration of an earlier decision in the case: (1) an intervening change in controlling law, (2) new evidence, or (3) the need to correct a clear error of law or to prevent manifest injustice." United States v. Adegbite, 877 F.2d 174, 178 (2d Cir. 1989).

After a full review of the prior decisions, the Court has determined that the law of the case is settled as to certain issues as explained below.

### a. Fourth Amendment Claim

In this case, the Court has already held that "[P]laintiffs have not pointed to any Second Circuit cases holding that Fourth Amendment seizures occur when foster children in the state's legal custody are moved from one foster home to another. Thus their Fourth Amendment claim fails as a matter of law." (Opinion [dkt. no. 139], at 24.) Nothing Plaintiffs have

presented to the Court alters this analysis; whether viewed as the law of the case or a decision on the merits, the Fourth Amendment claim must fail for the all the reasons provided in the earlier Opinion.

### b. Due Process Claims

In deciding the Agency Defendants' motion for summary judgment, Judge Griesa stated, "biologically-related foster parents are to be afforded constitutional due process protections with regard to removal of foster children under their care," (id. at 16 (citing Rivera v. Marcus, 696 F.2d 1016, 1024-25 (2d Cir. 1982)), and held that "plaintiffs have shown that they possess a constitutionally protected liberty interest in the integrity of their kinship foster family as a matter of law." (Id.) This holding was reiterated in the subsequent order [dkt. no. 153] denying Plaintiffs' motion for reconsideration and is the law of the case.

Judge Griesa also held, however, that individuals in kinship foster relationships are not entitled to the same substantive due process rights provided to extended families in other contexts and that the Court need not employ the fundamental rights analysis elucidated in Moore v. City of E. Cleveland, Ohio, 431 U.S. 494, 505-06 (1977) (stating that "the choice of relatives in this degree of kinship to live together

may not lightly be denied by the State."). Although kinship
foster families have a recognized liberty interest, "the Second
Circuit suggested that this interest may not implicate a
fundamental right," and so "the court should not conclude that
the Riveras, as grand-aunt and grand-uncle to [the children],
had a fundamental right to substantive due process protections
when the agency defendants decided to remove their grand-
nieces." (Opinion [dkt. no. 139], at 21.) Accordingly, in
keeping with the law of the case, the Court denies Plaintiffs'
substantive due process claims for the reasons set forth in the
earlier opinions.

Judge Griesa also held that "New York's regulations, which
provide for an Independent Review and a Fair Hearing, are
constitutional, even in the context of immediate removals."
(Id. at 17; see also Smith v. v. Organization of Foster Families
for Equality and Reform ("OFFER"), 431 U.S. 816 (1977).) He
carefully noted, however, that "if constitutional procedures are
not properly followed or applied, this can result in violations
of constitutional rights." (Opinion [dkt. no. 139], at 17.)
Thus the Court need only address "the adequacy of the procedures
utilized" by City Defendants and not the validity of the Supreme
Court approved regulations themselves. (Id.)

Finally, in both the summary judgment decision (Opinion [dkt. no. 139], at 17) and the denial of Plaintiffs' motion for reconsideration (Opinion [dkt. no. 153], at 7-9), Judge Griesa held that the removal itself did not violate due process. As the Agency Defendants who initially effected the removal were found not to have committed any constitutional violation, the Court cannot find that the City committed a violation in relation to those same acts of removal. The law of the case is that the emergency removal did not violate the Plaintiffs' rights to due process, and any allegations related to the pre-removal process therefore need not be addressed further.

Defendants urge that the law of the case doctrine dictates that the grant of summary judgment for Agency Defendants necessitates a grant of summary judgment for City Defendants as to all claims[8] on the basis that Judge Griesa's "broad findings [as to Agency Defendants] apply with equal force to City Defendants." This proves too much — as explained above, some of the findings do apply to City Defendants, but the previous decisions exhibit mindful circumscription of their findings and avoid reaching any issues not immediately before the Court. (See e.g., id. at 17 ("[P]laintiffs contest the adequacy of the

---

[8] Excepting, of course, the state law claims that were not reached, but over which, after dismissing all federal claims, the Court declined to exercise jurisdiction.

procedures utilized by the agency defendants . . . .") (emphasis
added); see also id. at 20 ("[I]n any event, the issue raised by
plaintiffs in this regard is not something that can be charged
to the agency defendants, who are making the present motion.")
(emphasis added).) While some of the language in the decisions
might leave itself open to a broader reading, the aforementioned
passages persuade the Court that it can reach the merits of the
remaining issues as they relate to City Defendants and Defendant
Johnson.


## III. DISCUSSION

### a. 42 U.S.C. § 1983

The survival of Plaintiffs' 42 U.S.C. § 1983 claims hinges
on whether there is evidence sufficient to raise an issue of
material fact as to whether Plaintiffs' Fourteenth Amendment due
process rights were violated. See City of Los Angeles v.
Heller, 475 U.S. 796, 799 (1986); Monell v. Dep't of Soc.
Servs., 436 U.S. 658, 691 (1978). For the claims against
Defendants in their personal capacities, there must also be
sufficient evidence to raise an issue as to the "personal
involvement" of each Defendant in the constitutional
deprivation. See Farrell v. Burke, 449 F.3d 470, 484 (2d Cir.
2006) ("It is well settled in this Circuit that personal
involvement of defendants in alleged constitutional deprivations

is a prerequisite to an award of damages under § 1983.")
(quoting Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994)). For
the claims against municipal Defendants and Defendants sued in
their official capacities, there must be sufficient evidence to
raise an issue as to whether the deprivation of rights was the
result of a municipal policy or custom. See Monell, 436 U.S. at
690-91.

### b. Procedural Due Process

#### i.   Liberty Interest

As it is already established that Plaintiffs have a liberty
interest in the integrity of their kinship foster family, the
Court can proceed directly to a determination of whether "the
procedures used by the state adequately protected that
interest." (Id. at 16 (citing Rivera v. Marcus, 696 F.2d 1016,
1026 (2d Cir. 1982) (citing Mathews v. Eldridge, 424 U.S. 319,
332-33 (1976))).)

#### ii.  What Process is Due

> The quantum of process constitutionally
> required in any given dispute is . . . not
> subject to specific measurement: For all its
> consequence, "due process" has never been,
> and perhaps can never be, precisely defined.
> [D]ue process is not a technical conception
> with a fixed content unrelated to time,
> place and circumstances.   [T]he phrase
> expresses the requirement of "fundamental
> fairness," a requirement whose meaning can
> be as opaque as its importance is lofty.
> Applying the Due Process Clause is therefore
> an uncertain enterprise which must discover

> what "fundamental fairness" consists of in a
> particular situation by first considering
> any relevant precedents and then by
> assessing the several interests that are at
> stake.

Rivera, 696 F.2d at 1026-27 (alteration in original) (citations

omitted) (additional internal quotation marks omitted).

Whether the process provided sufficiently protects a

party's rights is analyzed in light of three factors: the

private interest that will be affected by the official action;

the risk of erroneous deprivation through the procedure used and

the value of an additional or alternative procedural safeguards;

and the government's interest, including the additional burdens

an alternative procedure would entail. Mathews, 424 U.S. at

335.

In this case the Plaintiffs' liberty interest in

maintaining the integrity of their foster family is the interest

affected, and the claim that the administrative process is

unconstitutional as enacted was disposed of pursuant to the

Supreme Court's holding in OFFER. (Opinion [dkt. no. 139], at

17-18 (citing OFFER, 431 U.S. 816 (1977); Renaud v. Mattingly,

No. 09 Civ. 9303, 2010 WL 3291576, at *6 (S.D.N.Y. Aug. 10,

2010).) Consequently, Plaintiff's remaining argument, at its

core, is that the procedures Defendants actually employed gave

rise to an unconstitutional risk of erroneous deprivation

because they failed to provide "notice and an opportunity for hearing appropriate to the nature of the case." (Pls.' Mem. in Opp. [dkt. no. 188], at 12 (citing Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 542 (1985).)

More specifically, Plaintiffs assert that Defendants' failure to provide notice of their right to an Independent Review was itself a constitutional violation; that the Independent Review did not satisfy the constitutional mandate for a "prompt post-removal hearing" because it lacked adequate procedural safeguards; that the Fair Hearing did not cure the Independent Review's constitutional inadequacy as (1) it was not prompt (occurring approximately six months after the removal), (2) the delay was attributable to Defendants, and (3) the hearing "did not and could not provide any relief" that would "wipe[] the slate clean" and "restore[] the petitioner to the position he would have occupied" but for the government action. (Pls.' Mem. in Opp. [dkt. no. 188], at 14 (citing Armstrong v. Manzo, 380 U.S. 545, 552 (1965).)

### iii. **Notice & Opportunity to be Heard**

The Court first addresses Plaintiffs' claims that the City Defendants failed to provide constitutionally adequate notice. (See Decision After Review, at OCFS 765 ("[T]he agency did not issue a Notice of Removal but removed the[] children . .

. ."); see also Pls.' Ex. 28, Mem. of Valerie Russo, Ass't Comm'r of NYC ACS, Subject: Re-distribution of Form CS-701D [dkt. no. 186-5] ("It has come to our attention that a number of foster parents are still not receiving the written notice of removal when a[n]. . . emergency removal is made from their home.").) Although Defendants assert that "Plaintiffs received notice of their right to a [sic] Independent Review such that they were able to request one on Monday, April 3, 2006 — the first business day after the removal," this does not necessarily excuse Defendants' failure to abide by proper procedures. As noted above, the regulations require that notice be given prior to removal in non-emergency situations or upon removal, or as soon as is practicable thereafter, in the case of emergency removals. Moreover, they require that the notice provide the reason for removal and advise the Foster Parents of their right to request an Independent Review. N.Y. Comp. Codes R. & Reg. tit. 18, § 443.5(a)(2). As explained in Spinelli v. City of New York, where the plaintiff argued that the City never provided her with post-deprivation notice and a hearing as required by City regulations following the revocation of her gun dealer license and confiscation of her firearms,

> Had th[e] regulation [providing for written
> notice] been complied with, the notice might
> have been sufficient, depending on the
> specificity of the grounds provided and the

28

> promptness of the hearing. The cursory
> letters sent to [Plaintiff], however, only
> informed her of the license suspension and
> the status of the investigation. . . . The
> "notice" given to [Plaintiff] plainly failed
> to "reasonably . . . convey the required
> information" that would permit her to
> "present [her] objections" to the City.
> Mullane v. Cent. Hanover Bank & Trust Co.,
> 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed.
> 865 (1950).

579 F.3d 160, 172 (2d Cir. 2009).

Here, Defendants do not appear to argue that they provided

notice as required but rather that the Independent Review was

nonetheless provided in a timely fashion. However, it does not

follow from the fact that Plaintiffs requested and received a

timely Independent Review that City Defendants provided adequate

notice. See id. ("Despite the inadequate notice, [Plaintiff],

with counsel's assistance, was able to reinstate her . . .

license . . . . The City argues that, because [Plaintiff] was

able to have her license suspension lifted and to retrieve her

property in less than two months, her due process rights were

not violated. This is a non-sequitur. [Plaintiff]'s eventual

success did not result from the City's affording her due

process, but despite its absence.") Indeed, Defendants' Rule

56.1 Statement credits the children's law guardian, Norah

Bowler, for telling Ms. Rivera that she could ask for an

Independent Review. (Defs.' 56.1 Statement ¶ 91.) Here, as in

Spinelli, "adequate notice consists of more than not obstructing

29

a lawyer's investigation. The fact that . . . counsel eventually learned of the specific nature of the charges . . . does not obviate the City's failure to provide adequate notice of those charges. The City has advanced no legitimate reason for not immediately providing . . . the information . . . needed to prepare meaningful objections or a meaningful defense. . . ." Spinelli, 579 F.3d at 172.

While the government's failure to provide proper notice is troubling, this case differs from Spinelli in a few respects: here, Plaintiffs availed themselves of the Independent Review, which provided at least some form of prompt post-deprivation review; the Spinelli plaintiffs opted to resolve their issues outside of the administrative appeals process because that process "was not available to Spinelli during the City's pending investigation into [the] report. . . . Spinelli would not have been entitled to a hearing until the completion of the investigation . . . which . . . could take 'months to . . . years' to decide." Id. at 173. Moreover, the Independent Review itself occurred within 10 days of the removal and provided notice of the additional safeguards provided by the subsequent stages of the administrative appeal process. For these reasons, the notice was not constitutionally inadequate.

Next, Plaintiffs bring forth evidence indicating that the City's investigation of the abuse allegations was not conducted

in a timely fashion. See N.Y. Soc. Serv. L. § 424(7) (requiring child protective service investigators to "determine, within 60 days, whether the report is 'indicated' or 'unfounded'"); (see also Pls.' Ex. 6, Summary of Three Most Recent Investigations [dkt. no. 186-3], at OCFS 836 (indicating that the investigation was "due on 5/30/06," "submitted on 07/12/06 for review and closing," and on 07/14/06 was "completed" and "being closed today 'Unfounded' via connections.")). Plaintiffs assert that this delay led to repeated adjournments of the post-deprivation Fair Hearing and denied them an opportunity to be heard; however, the record is clear that a substantial portion of the delay was due to the Riveras' adjournment requests. (See, e.g., Pls.' Ex. 15, Fair Hr'g Tr. [dkt. no. 186-4], at OCFS 006 ("The case was originally scheduled for July 12[th]. It was then adjourned at the appellant's request to July 17th and that was for the purpose of obtaining the SCR report, which had not yet been determined. It was adjourned again on that date to August 24[th] and that was again because the ACS investigation was not complete.") (emphasis added). Plaintiffs assert that these requests were made to allow the investigation to be completed and that they requested only a brief adjournment of the July 17th date, which the Court assumes to be true for the purposes of deciding this motion.

Because the adjournments were granted at the request of the Plaintiffs, this Court cannot find that Plaintiffs were denied a prompt post-deprivation hearing. While Plaintiffs were placed in an unfortunate situation as a result of the confusion surrounding the investigative and appeals processes, they were provided an opportunity to be heard on July 12th and at that time could have raised the issue of the City's failure to complete its investigation. The decisions to put off the hearing dates and to negotiate with FSSU for the children's return by means outside the administrative appeals process make clear that Plaintiffs were not denied a meaningful opportunity to be heard but rather actively chose to pursue alternative paths to resolution.

Plaintiffs also suggest the City's attempt to obtain an order from Family Court of the State of New York, County of Queens, constituted a denial of due process, as Plaintiffs, at that time considered "former" foster parents, had no standing to appear and contest the issue. This order, it is asserted, was another attempt to deny them their constitutionally mandated opportunity to be heard. (See Pls.' Ex. 32, Permanency Hearing Order [dkt. no. 186-6].) Assuming that Plaintiffs' interpretation of state law is correct and that they had no means to contest an adverse Family Court order, the Family

Court's jurisdiction to review the status of children on the petition of certain specified parties was part of the administrative appeal scheme that was approved by the Supreme Court in OFFER. Accordingly, seeking review pursuant to that scheme cannot be considered an action in contravention of the appeals process. Moreover, the Family Court order did not deprive the Plaintiffs of their right to the Fair Hearing, or, in the event of an adverse Fair Hearing decision, of further judicial review pursuant to New York's Article 78, which provides a final judicial safeguard against unconstitutional deprivations under the State's regulatory scheme. N.Y. C.P.L.R. §§ 7801-06 (McKinney 2015).

Finally, Plaintiffs present evidence that after "the OCI investigation produced no further evidence to substantiate th[]e allegations," "the Agency determined the allegations were not credible," the Children's Advocacy Center and police found the allegations to be "unfounded," and the "children admitted that their original stories were untrue, and [that] they had been told to lie," ACS nonetheless "refused to allow the children to be returned, despite the Agency's determination that the children would be safe, and "failed to make any effort to ascertain the facts of the case." (Pls.' Ex. 13, Decision After Fair Hearing [dkt. no. 186-4], at OCFS 743.) They further

assert that this procedure conflicts with that provided in the City's own outline of the Independent Review procedures:

> If, after the Independent Review, the Office of Advocacy renders a decision that differs from OCI's recommendation . . . the Office of Advocacy will review its decision with OCI. If OCI has obtained new information that was not discussed at the Independent Review, the Office of Advocacy will issue another Form CS-701D, which will advise the foster parent of the right to request another Independent Review.
>
> If OCI has not obtained any new information and its recommendation differs from the decision of the Independent Review, the Office of Advocacy and OCI will discuss their respective conclusions. If the conclusions . . . still differ, the Deputy Commissioners who oversee the Office of Advocacy and OCI will review the Independent Review decision and the OCI recommendation. If necessary, they will consult with the Commissioner. They will then render a final decision, which will be sent to the parties.

(Independent Review Outline, at 7.)

Taking these various allegations as true, the Court still cannot say that the Plaintiffs were denied an opportunity to be heard. Again, Plaintiffs were granted an Independent Review, and had the opportunity to raise any issues regarding that review and the events that followed at a Fair Hearing on July 12, 2006, if the Plaintiffs had elected to proceed as scheduled. Even failure to comply with internal regulations or law, if

there was a such a failure, is not indicative of a denial of Due

Process. Indeed, the Supreme Court has held that even

> an unauthorized intentional deprivation of
> property by a state employee does not
> constitute a violation of the procedural
> requirements of the Due Process Clause of
> the Fourteenth Amendment if a meaningful
> postdeprivation remedy for the loss is
> available. For intentional, as for
> negligent deprivations of property by state
> employees, the state's action is not
> complete until and unless it provides or
> refuses to provide a suitable
> postdeprivation remedy.

Hudson v. Palmer, 468 U.S. 517, 533 (1984). While the liberty

interest at stake here is different in kind from the property

interests at stake in Hudson (and Spinelli, for that matter),

the larger point holds: the administrative appeals process and

supplemental Article 78 proceedings provided Plaintiffs the

opportunity to obtain suitable post-deprivation remedies.

Plaintiffs' involvement in the delay renders their arguments to

the contrary meritless.

On this record, no reasonable jury could conclude that

Plaintiffs have raised a genuine issue of material fact as to

whether they were provided adequate notice and an opportunity to

be heard. Accordingly, Plaintiffs' procedural due process

claims are dismissed. Furthermore, even if Plaintiffs were

deemed to have raised an issue of fact as to their due process

claims, their claims against City Defendants and Defendant

Johnson would nonetheless fail for want of sufficient showings

on the issues of municipal liability and personal involvement

and because Defendants have successfully raised the defense of

qualified immunity.

### c. **Municipal Liability**

Proof of municipal liability can take four forms:

> The plaintiff may allege the existence of
> (1) a formal policy officially endorsed by
> the municipality; (2) actions taken by
> government officials responsible for
> establishing the municipal policies that
> caused the particular deprivation in
> question; (3) a practice so consistent and
> widespread that it constitutes a custom or
> usage sufficient to impute constructive
> knowledge of the practice to policymaking
> officials; or (4) a failure by policymakers
> to train or supervise subordinates to such
> an extent that it amounts to deliberate
> indifference to the rights of those who come
> into contact with the municipal employees.
> There must also be a causal link between the
> policy, custom or practice and the alleged
> injury in order to find liability against a
> municipality.

Shapiro v. Kronfeld, No. 00 Civ. 6286 (RWS), 2004 WL 2698889,

at *21 (S.D.N.Y. Nov. 24, 2004) (internal citations omitted).

There must also be a causal link between the policy, custom or

practice and the alleged injury.  See Batista v. Rodriguez, 702

F.2d 393, 397 (2d Cir. 1983).  Plaintiffs bring claims under

each of these theories.

1. "A formal policy officially endorsed by the municipality"

Plaintiffs assert that the City's failure to amend its removal policy for kinship foster families in the wake of Rivera v. Marcus renders the official policy unconstitutional. This is incorrect as a matter of logic and law. A policy can be constitutionally adequate as to both kinship and traditional foster parents so long as it is tailored adequately to protect the weightier of the private interests. Indeed, the Supreme Court in OFFER held the New York policy constitutionally adequate "even on the assumption that appellees have a protected 'liberty interest.'"

Plaintiffs also take issue with the City's policy that an independent review can approve a decision that "was not warranted." (Pls.' Ex. 23, Criteria Used in Making Independent Review Decisions [dkt. no. 186-5].) However, this is merely to say that the Independent Review Officer, who has the benefit of hindsight, can find that although a decision was ultimately "not warranted," the action was "justified" by the facts on the ground at the time of the action. Moreover, the Independent Review Officer's determination is merely the first of a multi-step appeals process, not the final decision. As such, that decision does not harm Plaintiffs' due process rights, which allowed them a Fair Hearing as a means of further review. The sufficiency of the appeals process as a whole has been

repeatedly upheld, and, accordingly, Plaintiffs fail to raise an triable issue of fact as to whether the City is subject to municipal liability under § 1983 on the basis of its official policy.

2. "Actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question"

Plaintiffs claim that various City policymakers "approved the decision not to return [the children] to the Riveras, and not to provide a hearing to plaintiffs." The named officials are legal advisors in various positions within the City or the Agency, as well as the "director of the City's foster care program," and "an ACS director." However, Plaintiffs have failed to come forward with any evidence that any of these employees has "final authority to establish municipal policy" (emphasis added) and therefore have not raised any issue of fact as to their (and the City's) liability on this theory. Moreover, ACS officials did afford Plaintiff the mandated Independent Review in a timely fashion (and were not required to provide an additional hearing), and OCFS officials did not cause the delay prior to the Fair Hearing, which was the result of Plaintiffs' adjournment requests.

3. "A practice so consistent and widespread that it constitutes a custom or usage sufficient to impute constructive knowledge of the practice to policymaking officials"

It is unclear whether Plaintiffs' complaints concern only official policy or if they also assert that the City's practices subject it to municipal liability. Plaintiffs do cite the deposition testimony of Dana Guyet, ACS' Director of Advocacy, (Pls.' Ex. 65, Guyet Dep. [dkt. no. 186-12]), while making claims about official "City policy," so for the purposes of this motion, we assume that they challenge both the custom or usage and the official policy. First, the Court notes that in many cases Ms. Guyet's statements are not as broad as Plaintiffs make them out to be. Second, even assuming the City does customarily follow the practices described, Plaintiffs are required to show that the practices bear a causal relationship to a constitutional deprivation. Plaintiffs do not and cannot make such a showing, and accordingly, they fail to raise an issue as to municipal liability under this theory.

4. "A failure by policymakers to train or supervise subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees"

To prove municipal liability under this final theory, plaintiffs must show: 1) that "the policymaker know 'to a moral certainty' that her employees will confront a given situation"; 2) "that the situation presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation"; and 3) that "the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights." Walker v. City of New York, 974 F.2d 293, 297-98 (2d Cir. 1992). "Where the plaintiff establishes all three elements, then we think it can be said with confidence that the policymaker should have known that inadequate training or supervision was so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." Id. (citations omitted) (internal quotation marks omitted).

Here, Plaintiffs have presented sufficient evidence to demonstrate that policymakers are aware that the City and authorized agencies will confront emergency kinship foster child removals. Indeed, this is precisely why there is a policy in place for such removals and appeals of such removals. However, they have not shown that training would make these choices any less difficult. Put simply, social workers face incredibly

complex situations in which they are required to make quick decisions under intense pressure while balancing a variety of competing interests that place them between Scylla and Charybdis — "[i]f they err in interrupting parental custody, they may be accused of infringing the parents' constitutional rights. If they err in not removing the child, they risk injury to the child and may be accused of infringing the child's rights." van Emrik v. Chemung Cnty. Dep't of Soc. Servs., 911 F.2d 863, 866 (2d Cir. 1990). Plaintiffs do not indicate how additional training would alter this calculus in such way as to reach a "correct" result more often, and the administrative appeals process already provides for a prompt Independent Review followed by a Fair Hearing and Article 78 proceeding, any of which can remedy the constitutional inadequacies, if any, of the initial removal.

Finally, Plaintiffs fail to show that the wrong choice by a city employee in such a situation will frequently cause the deprivation of a citizen's constitutional rights. Because the appeals process provides post-deprivation safeguards and has been deemed constitutional, even a "wrong" decision will often be a constitutionally permissible one.

Because there has been no showing sufficient to raise a triable issue of fact regarding municipal liability, the claims

against the City and City employees and independent officers acting in their official capacities (John Mattingly, Mina Shah, Michael Warren, Carolyn Williams, and Diana Cortez) must fail.

### d. **Personal Involvement**

In order to succeed on their § 1983 claims against John Mattingly, Mina Shah, Michael Warren, Carolyn Williams, Diana Cortez, and John Johnson in their personal capacities, Plaintiffs must raise an issue as to each individual's "personal involvement" in an underlying constitutional violation.

First, Plaintiff presents no evidence that Defendant John Mattingly, the commissioner of ACS, was personally involved in the removal or subsequent decision not to return the children. "An individual cannot be held liable on for damages under § 1983 merely because he held a high position of authority." Back v. Hastings on Hudson Union Free Sch. Dist., 365 F.3d 107, 127 (2d Cir. 2004). Plaintiffs points to no specific actions taken by Defendant Mattingly that would allow a jury to conclude that he was personally involved in the events underlying Plaintiffs' claims, and thus the causes of action as against Defendant Mattingly in his personal capacity are dismissed.

Similarly, there is no evidence that Defendant Shah was personally involved in any constitutional violation. Plaintiffs allege only that Defendant Shah participated in the Independent

42

Review process and "followed those City policies" that they allege are unconstitutional. (Pls.' Mem. in Opp. [dkt. no. 188], at 20 n.17.) As the policies have been upheld as constitutional, there is no showing that Defendant Shah participated in an underlying violation and the claims against here in her personal capacity are dismissed.

As to Defendant Johnson, there has been no showing that OCFS deprived Plaintiffs of their constitutional rights, but even if the Court had found that OCFS's delayed proceedings and decision to remand were constitutionally unsound, Defendant Johnson was not directly involved in the actions leading to the delay. Plaintiffs assert that Defendant Johnson's appearance in this litigation, through counsel, constitutes personal involvement in the underlying denial of due process, but this is not the case. As has been well covered earlier in this Opinion, the timing of the Fair Hearing was the result of adjournment requests by Plaintiffs. Defendant Johnson is not required to provide more process than the constitutionally adequate administrative appeals process calls for. As a reasonable jury would have no basis for finding that Defendant Johnson personally participated any unconstitutional deprivation of rights, the claims against him in his personal capacity are dismissed.

The claims against Defendants Warren and Williams in their personal capacities must be dismissed as well. Plaintiffs allege that Defendants Warren and Williams, ACS employees with "final authority for determining whether to move the girls from one foster home to another," (Pls.' Mem. in Opp. [dkt. no. 188], at 22 (citing Pls.' Ex. 40, ACS Child Evaluations in Foster Care (Procedure 98) [dkt. no. 186-7])), are liable because they "approved of the removal of the girls," and failed to "return the girls, provide a pre-deprivation hearing or provide a prompt post-deprivation hearing." Again, the removal was not a constitutional violation, and no pre-deprivation hearing is constitutionally required. Even assuming that they did approve an improper removal, this does not constitute involvement in a constitutional violation. As the only colorable claim of a constitutional violation stems from issues of notice and the delay in the proceedings, and there no evidence has been presented suggesting that Warren and Williams were responsible for that delay, they cannot be personally liable.

Finally, the claims against Defendant Cortez in her personal capacity must also be dismissed. Plaintiffs assert that Defendant Cortez had an obligation to "ensure that the Riveras and the girls were either reunited or were provided with due process of law." (Pls.' Mem. in Opp., [dkt. no. 188], at

22.) However, she had no involvement in the ongoing review process and no clear obligation to intervene given that the OCFS hearing that was pending was intended to provide additional procedural protection. There is no evidence that she was involved in the lack of notice, untimely investigation, or postponement of the Fair Hearing, and thus she cannot be personally liable on claims arising from those issues.

### e. Qualified Immunity

Even if the above-mentioned employees were shown to have been personally involved in constitutional deprivations, they would nonetheless avoid personal liability for money damages on the basis of qualified immunity. Qualified immunity attaches and protects government officials if "their conduct did not violate clearly established right of which a reasonable person would have known" or "it was objectively reasonable to believe that [their] acts did not violate those clearly established rights." Tenenbaum v. Williams, 193 F.3d 581, 596 (2d Cir. 1999) (quoting Young v. County of Fulton, 160 F.3d 899, 903 (2d Cir. 1998). "As the qualified immunity defense has evolved, it provides ample protection to all but the plainly incompetent or those who knowingly violate the law. . . . [I]f officers of reasonable competence could disagree on this issue, immunity should be recognized." Malley v. Briggs, 475 U.S. 335, 341 (1986).

In the context of suspected of child abuse, qualified immunity plays a particularly essential role:

> Though a decision to remove a child from parental custody implicates the constitutional rights of the parents, it obliges protective services caseworkers to choose between difficult alternatives . . . . It is precisely the function of qualified immunity to protect state officials in choosing between such alternatives, provided that there is an objectively reasonable basis for their decision, whichever way they make it.

van Emrik v. Chemung Cnty. Dep't of Soc. Servs., 911 F.2d 863, 866 (2d Cir. 1990). Defendants have presented sufficient evidence to show that it was objectively reasonable for them to believe that they were not violating clearly established rights in light of the initial allegations by the children, the tension among the competing legal obligations caseworkers and their supervisors must strive to balance, the discretion provided by New York's constitutionally adequate review procedures, and the Supreme Court's finding those review procedures constitutionally adequate in OFFER. Plaintiffs have proffered no evidence to the contrary, so summary judgment for Defendants is appropriate.

### f. State Law Claims

In light of the dismissal of all claims against City Defendants and Defendant Johnson under federal law, the Court declines to retain jurisdiction over the remaining state law

claims; accordingly, all claims against these Defendants are dismissed without prejudice.

## CONCLUSION

For all of the above reasons, Defendants' motions [dkt. nos. 180, 196] are GRANTED, and all federal claims against the City of New York, John Mattingly, Mina Shah, Michael Warren, Carolyn Williams, Diana Cortez, and John Johnson, individually and in their official capacities, are hereby DISMISSED. Plaintiffs' state law claims against the aforementioned Defendants are hereby DISMISSED WITHOUT PREJUDICE.

SO ORDERED.

Dated: New York, New York
      March 30, 2015

*Loretta A. Preska*

LORETTA A. PRESKA, Chief U.S.D.J.